Appeal by JOHN FEATHER, attorney in fact of JOHN OBLIN-GER, and of GEORGE FEATHER and SUSANNA his wife, from the decree of the Circuit Court, in the matter of the money paid into the Orphans' Court, arising from the sale of the real estate of CHRISTIAN OBLINGER, deceased.

The return days of process into the Circuit Court from the Common Pleas, Quarter Sessions or Orphans' Court, by act of Assembly, are the third Monday in *March*, the first Monday in *September*, and the second Monday in *December* in each year.—A *certiorari* is not necessary to remove a record on appeal from the Orphans' Court to the Circuit Court.

Where an appeal is taken from the Orphans' Court to the Circuit Court, the appeal is not required to be filed before the next return day after it is taken, nor can any rule be taken in the case until then: but if the record be filed before the return day, and the cause is heard, and decided by the Circuit Court without objection, it is too late to take that objection in the Supreme Court, after the cause is brought there upon appeal, by a motion to quash.—Generally, if a party goes to trial by consent in a lower court at an earlier term than he was compellable to do, if he make no objection then, his objection will not avail him afterwards.

C. O. made his will in 1798, and died soon after, seized, as he supposed, of a large real estate. By his will, after disposing of his personal estate, he directed that his land should be occupied in a certain manner for three years, then valued by twelve men, and his son *John* have the right to take it at the appraisement; if he refused, the other children in succession to have the right, if none agreed to take it, it was to be sold by the executors, and in either event the money divided among his heirs. "But the sum of £400 is to be charged on the said estate, and remain in the hands of the purchaser:" the interest on this sum he directed to be paid to his wife, and at her death this sum to be divided among his *three eldest children* or their heirs; "and as touching the money arising from my land and estate, I give and bequeath to *my son J. O. first and foremost*, £1000, because he is my only son, along with his share, which he shall have with my other children." His personal estate was exhausted, and his real estate sold on execution within two years after his death; a balance of £400 in 1801 was decreed to be put to interest, and the interest paid the widow. Widow died in 1803, and in 1814 a *scire facias* was issued upon the judgment given to secure the £400 in which a verdict was rendered in 1826, and the proceeds brought into the Orphans' Court for distribution, in 1828. *Held:* That J. O. was not entitled to be paid out of this fund, his legacy of £1000; but that he took, as to this, an equal share, as one of the "three oldest children" of the testator, that his interest in the fund was personal, not real estate, and a judgment against him no lien on it.—J. O. had taken the benefit of the insolvent laws, in 1800, the assignees then appointed had not qualified, and were dead. *Held:* That the Orphans' Court should retain his fund until the next term of the court in which he was discharged, to have assignees appointed to receive it, but if none were then appointed it should be paid to J. O.

By the express provision of the insolvent law, the statute of limitations does not run against debts due by an insolvent debtor.

Lapse of time, much greater than that allowed by the statute, may raise the presumption of the payment of such debts; but when the creditor returns no fund but a debt to become due on a future contingency, no presumption of payment would arise before the fund came to hand.

When an appeal is taken from a decree of the Orphans' Court, it would be wrong in that court to order the money to be paid over under that decree, while the recognizance is writing, or the party bringing in his bail.

A motion was made by *Hopkins*, to quash this appeal, on the ground that the cause was not in the Circuit Court when the

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian Oblinger, deceased.)

decree of that court was made. On the 19th April, 1830, the Orphans' Court made their decree in the case from which this appeal was taken, and a *certiorari* issued, tested the 15th day of March, 1830, and returnable the first Monday of September then next; and on the 3d of May, 1830, the Circuit Court, upon argument, affirmed the decree of the Orphans' Court, from which this appeal was taken.

He contended that the cause was not in the Circuit Court before the return day of the *certiorari*, and the decree of that court was therefore without jurisdiction.

*Montgomery* and *Norris*, contra, argued that the writ of *certiorari* was unnecessary: by the appeal the record was removed without it; but as the party had voluntarily appeared before the return day of the writ, and the cause was then heard, he could not now allege want of jurisdiction in the court.

The court overruled the motion to quash, for reasons assigned in the opinion of the court, and ordered the appeal to be argued.

The case was this: *Christian Oblinger*, seized of a large estate, made a will, dated the 8th of December, 1798, by which, after providing that his burial charges and debts should be paid, he directed that his wife should keep in her possession his other estate for her subsistence and use, as she shall find it necessary. That his son, *John Oblinger*, should live in the large house, with his mother, and work the plantation for her. Of what he sowed and gathered in, two-thirds were to be his, and one-third part his mother's: Then, after directing as to cider, fruit, flax, firewood, &c. to be furnished her, he says, such fee or rent shall continue three years; after that, the plantation was to be valued by a jury of twelve men. His son *John* was to have a right to take it according to the valuation: if he did not, another of his heirs was to have that privilege. Three months after the valuation the money was to be paid to his executors, who were to give a deed to the purchaser. If none of the heirs took it, it was to be sold and the money thence arising to be divided among his heirs. But the sum of four hundred pounds, was to be charged on the said estate, and remain in the hands of the purchaser; the interest of which he gave to his wife, "along with the lesser house for her to dwell in, as long as she lived, and all the household and kitchen furniture, to be used at her pleasure." After her death, the four hundred pounds, and what was left of the household and kitchen furniture, were to be divided among his *three eldest children* or their heirs. He then proceeds: "and further touching the money arising out of my land and estate, I give and bequeath to my son, *John Oblinger, first and foremost*, one thousand pounds, because he is my only son, along with his share, which he shall have with my other children." After giving to his son-in-law, *Nicholas Ziller*, one shilling, and to

his sons-in-law *George Feather* and *Peter Feather*, and the son of *Peter Feather*, the sums received of him, he directs that *Peter Feather's* son, born of his daughter *Mary*, shall have, if he arrived " at the age of twenty-one years, one hundred and fifty pounds, which his executors should retain in the sum of his plantation till he becomes of age." But if he died before the age of twenty-one years, the money should be given to his other three children as a legacy, by his executors, to each fifty pounds. Further, he willed that his eldest daughter, after she had received her share for her and her heirs of his executors, might choose and appoint guardians for her and her heirs; and she should have a right to make use of said sums as need and her circumstances required, and demand it of her guardian. If his wife died before the expiration of the three years mentioned, his executors were to have what there was of the personal property appraised, and do as above mentioned with his plantation: " but always that my son *John Oblinger* may keep my plantation at the appraisement, if he fulfils the said articles and payment." After naming his executors, and revoking and annulling other wills, and dating the will, he added two other items, by which he bequeathed to his grandchild, *Elizabeth Feather,* one complete bed and bedstead, and directed, that after the decease of his wife, she should have the sum of fifty pounds, out of his estate; and then willed and ordered that his daughter *Barbara* should have the sum of fifty pounds, after the decease of his wife; and declared it to be his full meaning and will that she should be considered, and be an heir as one of his four childen; but to *Nicholas Ziller* he only bequeathed as above.

After the death of testator, which happened before the 27th December, 1798, his personal estate was exhausted, and his real estate in two years after his death, was sold on executions, and the sum of seven hundred and fifty pounds only remained after the payment of his debts. This being brought into the Orphans' Court, that Court on the 29th September, 1801, decreed the sum of four hundred pounds, bequeathed by the testators will to his widow, to be put out on real security, and the interest thereof to be paid to her during her life, and after her death, that the principal be paid, and distributed to and among the legal representatives of the testator, according to law, and the order of the court.

This sum was loaned to *John Bitzer*, who gave his judgment bond for it: upon which judgment was entered to November term, 1801. On this judgment a *scire facias* issued in 1814, which was transferred from the Common Pleas to the District Court, to June term, 1820, and tried on the 9th September, 1824; and the money now in court was made on that judgment.

The remaining sum of three hundred and fifty pounds was

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian Oblinger, deceased.)

divided equally among the children, without regard to the legacy of one thousand pounds to *John*.

The widow died in 1803. *John Oblinger, Susanna* intermarried with *George Feather*, and *Barbara* intermarried with *Nicholas Ziller*, were the "three eldest children" of the testator, between whom he directed the four hundred pounds, after the death of his wife, to be divided.

Upon the trial of the *scire facias*, the defendants established the payment of one third of the four hundred pounds, her share, to *Barbara Ziller*, also of fifty pounds to *John Oblinger*, and sixty pounds to *Susanna Feather*, and the verdict was rendered for the balance of two shares. The defendants claimed a credit of fifty-six pounds five shillings, paid on the 1st of June, 1806, to *John Sheaffer*, intermarried with *Elizabeth Feather*, on account of the legacy of fifty pounds bequeathed to her, but the receipt for this payment was overruled, and as to that sum, it was agreed by the counsel of the parties, to leave the question "open for consideration on the final settlement of *Christian Oblinger's* estate."

*Susanna's* share, amounting to the sum of two hundred and eighty-six dollars and fifty-six cents, was paid over to her by Mr. *Buchanan*, the counsel of the plaintiff in the *scire facias*. And the amount paid into the Orphans' Court was the sum of two hundred and ninety-six dollars and seventy-five cents, the payment to *Sheaffer*, with its interest, and the amount of *John's* share being three hundred and forty-five dollars and seventy-six and a half cents, supposing the fifty-six pounds five shillings to have been rightly paid.

The executors of *John Bitzer* claimed to be paid the said sum of two hundred and ninety-six dollars and seventy-five cents, on account of the payment to *Sheaffer*.

*John Oblinger*, by his attorney *John Feather*, claimed to be paid his share, three hundred and forty-five dollars and seventy-six and an half cents; also, the one half of the said sum of two hundred and ninety-six dollars, and seventy-five cents, and *George Feather*, in right of his wife, claimed the other half of that sum.

*David Rinehart* claimed as a judgment and bond creditor, of *John Oblinger*, "who took the benefit of the insolvent laws in the court of Common Pleas of Lancaster county, at August term, 1801," to be paid the whole fund in court.

*David Rinehart's* judgment against *John Oblinger*, was entered on the 20th January, 1800, to November term, 1799. On the 24th September, 1800, on affidavit of the defendant, a rule to show cause why this judgment should not be opened, was taken, and on the 13th February, 1801, a rule to take depositions entered. This proceeding there rested, nothing further having been done upon the rule.

*Rinehart*, also showed a bond given by *John Oblinger* to *Charles*

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian Oblinger, deceased.)

Rinehart, on the 6th June, 1798, for fifty pounds, assigned on the 2d August, 1800, to him. Also, a judgment in favour of Michael Berndheisly against John Oblinger and David Rinehart, to May term, 1799, on a bond, dated 9th March, 1798, which was paid by the said David Rinehart.

John Oblinger took the benefit of the insolvent laws, to August term, 1800, in the court of Common Pleas, and executed an assignment in trust for his creditors; the assignees never gave bond, and were dead at the time the decree of the Orphans' Court was entered in this case. Oblinger, after taking the benefit of the insolvent laws, removed to the state of Ohio.

Motions, corresponding with these several claims, were entered in the Orphans' Court.

That court denied the motion made on behalf of Bitzer's executors, (the payment to John Sheaffer being a mispayment,) and the motion in favour of David Rinehart, and decreed that the share of John Oblinger should be paid to his assignees legally qualified to receive it, and that the fund should be detained until the court of Common Pleas should make an appointment of assignees, and that the one half of the sum of two hundred and ninety-six dollars, and seventy-five cents, the sum reserved to await the question as to the payment to Sheaffer by Bitzer, should be paid to George Feather, in right of his wife, the assignees of John Oblinger being entitled to the other half.

From these decrees of the Orphans' Court each party appealed to the Circuit Court, who on the 3d of May, 1830, affirmed the decrees of the Orphans' Court; and from this decree of the Circuit Court, John Feather, attorney in fact of John Oblinger, and George Feather, and Susanna his wife, appealed on 7th May, 1830, to the Supreme Court, for the following reasons, viz:

1. Because the court refused to order to be paid out of court to John Feather, attorney in fact of John Oblinger, the sum of three hundred and forty-five dollars and seventy-six and an half cents; and also the sum of one hundred and forty-eight dollars and thirty-seven and an half cents; and also because the court refused permission to the said John Feather, attorney in fact of George Feather and Susanna his wife, to take out of court the sum of one hundred and forty-eight dollars and thirty-seven and an half cents.

2. Because the court decreed that the sum of three hundred and forty-five dollars and seventy-six and an half cents should be paid out of court to the assignees of John Oblinger, if such assignees existed, and if such assignees did not exist, then to be paid out to such assignees as the court of Common Pleas should or might appoint.

3. Because John Feather, attorney in fact of John Oblinger, and of George Feather and wife, has in law and equity and justice, a right

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian' Oblinger, deceased.)

to take out of court the said sum of six hundred and forty-five dollars and fifty-one and an half cents, in favor of his constituents, the said *John Oblinger*, and *George Feather* and wife, the legatees of *Christian Oblinger*, deceased.

*Montgomery* for the appellants.—The whole fund in court was claimed as belonging to *John* under the bequest to him of one thousand pounds, by *David Rinehart*, on his judgment.

He contended, that by a fair construction of the will, *John* was only entitled to one-third of the four hundred pounds, after the death of the widow, but that the decree of the Orphans' Court of 1801, fixed the persons among whom the money was ultimately to be divided, and recognized the right of the three eldest children; and that this decree would, if any difficulty existed in the question, control the present distribution of the fund in court, as to this point.

He took two grounds in opposition to the claim of *Rinehart*, on his judgment.

1st. That the interest of *John Oblinger*, under the will of his father, was an interest in a legacy only, upon which a judgment against him was no lien.

2d. That the judgment of *Rinehart* was satisfied, in presumption of law, by lapse of time.

1st. By the will the testator directed that his land should be sold or that *John* should be permitted to take it at an appraisment, but that his executors should execute a deed; and *John* was only to have a share of the value or price. This although a charge upon the land, was no interest in it, which could be subjected to the lien of a judgment.

2d. It was true that *John Oblinger* had taken the benefit of the insolvent laws, but this neither arrested the operation of the statute of limitations, nor prevented the effect of lapse of time. The operation of the statute of limitations was not suspended while the act of 13th March, 1812, " for the relief of insolvent debtors residing in the city and county of Philadelphia, and their creditors," was held by the courts of this State to be constitutional and valid, *Hudson* v. *Carey*, 11 *Serg. & Rawle*, 10. *Ingraham on In*, 214–215, a lapse of twenty years satisfies a judgment, and here more than twenty years elapsed from the death of the widow, to the time when the claim was made on behalf of this judgment. The presumption too was fortified by the rule taken to show cause why the judgment should not be opened.

The controversy was between *John Oblinger* and *David Rinehart*, and the Orphans' Court had no right to interpose the assignees of *Oblinger*, who had never qualified, who did not claim, and who in fact were dead, to arrest the fund from *Oblinger*.

The benefit of the insolvent laws was taken by him in 1801, the

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian Oblinger, deceased.)

assignees never qualified, and in law the debts then due were presumed to be satisfied, and this proceeding abandoned.

Again, the Orphans' Court has no jurisdiction but in cases of trust under the act of 1713, and cannot decree money to a stranger to that trust, and therefore cannot order the money of the heir to his creditor, either with or without an application. The remedy of *Rinehart*, if his judgment were not satisfied, was by foreign attachment. He also referred to *Read's Dig.* 177. *Toller on Ex.* 235. *Ross* v. *M'Junkin*, 14 *Serg. & Rawle*, 364. *Kane* v. *Bloodgood*, 7 *Johns. Ch. Rep.* 90-113.

*Hopkins*, contra. If under the will *John Oblinger* was not entitled to the whole fund, then an average should take place among the legatees; and in that event *Bitzer's* executors should be allowed to come in on account of the money paid to *Sheaffer* in right of his wife *Elizabeth*.

But he contended that the legacy of one thousand pounds to *John*, was entitled to a preference. The testator had thought that he was wealthy, and his will was made under this impression; but it turned out that his estate was nearly insolvent, and the will can only be carried into effect *ci pres*, as near the intention of the testator as this change of circumstances will admit. It was not the intention of the testator to give his whole estate to his wife; as there was not enough to pay all, her legacy should abate in proportion: nor will any fair construction of the will authorise the distribution of the fund to the three eldest children, to the exclusion of the other legatees. Under the circumstances of the fund, the true construction of the will would be to distribute the fund to the legatees *pro rata*. He contended that as it appeared by the will that the legatees, except *John* and *Elizabeth*, had been advanced in the life time of the testator: that as there was a deficiency of assets, these advancements should be taken into view, in regulating the proportions which each should receive out of the fund.

But the legacy to *John* was entitled to be preferred. The will is that the oldest son shall *first* receive one thousand pounds; and the testator assigns the reason for this preference, " because he is my only son." Every expression in a will must, if possible, have effect given to it, and the only meaning of the words "*first and foremost*,'" in the will is that *John's* legacy is to be preferred.

He contended that the interest which *John* took under the will was an interest in the realty, and subject to the lien of judgments against him. If *John* had taken the real estate at the appraisement under the will, he certainly would have taken it as land. The fund in court must be considered as if the intention of the testator had been carried into full effect. The sale by the sheriff prevented this being done literally, but where the act of the law encroaches upon the intention of the testator, the encroachment

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian Oblinger, deceased.)

never goes beyond the necessity of the case. The four hundred pounds is expressly charged upon the land, and as it respects *John's* interest, who was to have taken the land at the appraisement, it is land. That interest has been converted into money, but the nature of the fund remains unchanged. *Diermond* v. *Robinson*, 2 *Yeates*, 324.

The judgment of *Rinehart* was entered before the sale by the sheriff; it was then a lien, and this sale has no other effect than to bring home the fund for distribution. *Nichols* v. *Postlethwaite*, 2 *Dall.* 131. *Gause* v. *Wiley*, 4 *Serg. & Rawle*, 509. *Reese* v. *Adams*, 16 *Serg. & Rawle*, 40. *Barnet* v. *Washabaugh*, 16 *Serg. & Rawle*, 410. *Otty* v. *Shuey's Ex'rs*, 1 *Rawle*, 294.

The circumstances of the case avoid the lapse of time, which is insisted on as evidence of the satisfaction of the judgment. The rule taken by the defendant to show cause why the judgment should not be opened is one circumstance, and his insolvency and removal from the State, another circumstance. And besides this the property in question was in action, and its reduction into possession depended upon a future contingency. · But by ·the act of assembly of 1729–30, *Read's Digest*, 180, in case of insolvency debts are protected from the lapse of time. The right to the fund depended on the death of the widow, and the fund itself was not recovered until 1824, and was not brought into court for distribution until 1828. The suit for the recovery of the money, (the *scire facias*,) was prosecuted for the interest of all concerned. That was issued in 1814; from the death of the widow in 1803, until this time, the only delay occurred, and that is insufficient to warrant any presumption of payment. From that time the rights of all were actively pursued. *Cope* v. *Humphreys*, 14 *Serg. & Rawle*, 15.

The court were right in arresting the fund until trustees were appointed under the application and discharge of *Oblinger*. A change of trustees of an insolvent has been allowed after the lapse of sixteen years, where the first trustees had never qualified. *Gray* v. *Hill*, 10 *Serg. & Rawle*, 436. Until the trustees do qualify, the estate of the insolvent is in *gramio legis*.

The decree of 1801, in no way concludes the inquiry now before the court, as by the terms of that decree the fund was to be brought into court for future distribution.

*Norris*, for the appellants in reply. The Orphans' Court have no jurisdiction as to the judgment creditors of legatees, when the fund on which the legacies are a charge is brought into court for distribution. The Orphans' Court, although it is a court of chancery, has its power limited by statutory provision, and cannot go beyond the statute.

By the statutes its jurisdiction is confined to the estates of dead men, and it can make no decree in favour of a creditor of a *cestui*

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian Oblinger, deceased.)

*que trust,* who has a fund within its jurisdiction. It has the incidental power of appropriating money to liens on real estate of record, but it cannot go further. Where the debtor denies the debt, it has no power by an adversary suit, to determine the question. It has no power to direct an issue, but in a question incidental to the estate of a decedent. To suffer this court to direct issues in any other controversy would be to make it a court of chancery with general jurisdiction.

The judge of the Orphans' Court had no right to go out of his proper *forum* to award the funds to assignees who had no existence, and to decide that the Common Pleas would create them. The creditors of *Oblinger,* whom the court undertook thus to protect, had no subsisting claim. Direct trusts, created by deed or will, as between *cestui que trust* and trustee, subsist unaffected by lapse of time. They are created by contract, and not by operation of law. All other trusts are affected by the statute of limitations, and lapse of time. And a stranger to the trust, who acquires an incidental right, as against the *cestui que trust,* will be barred by the statute, and his right effaced by time. Where the assignee does not act for a long time, the assignment is presumed to have been abandoned. *Adlum* v. *Yard,* 1 *Rawle,* 163.

The interest of *Oblinger* under the will, is an interest in personalty and not in the land. If he had taken it at the appraisement, he would have acquired an interest in the real estate; but until he did this, his only right was to a share of the proceeds of the sale of the land, which was never yet adjudged to be real estate.

The legacy to the wife of the testator was specific, and for that reason is not to abate. She was the chief object of the testator's bounty, and her legacy was to be first invested. And by the plain terms of the will, upon her death, the legacy thus invested was to be divided among the three oldest children of the testator. The construction of the will is derived from itself, and cannot be made to vary by circumstances occurring after the death of the testator, and which could not have been contemplated by him when he made the will.

The opinion of the court was delivered by

HUSTON, J., (who stated the facts.)—The return days of process, &c, brought into the Circuit Court from the Common Pleas, Quarter Sessions or Orphans' Court, are fixed by act of assembly, and are the third Monday in March, first Monday in September, and second Monday in December, in each year. It was objected here that as the *certiorari* removing the cause from the Orphans' Court to the Circuit Court, is not returnable for some months, we cannot proceed with the hearing. Whatever may have been the case, when the appeal from the Orphans' Court was direct to the Supreme

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian Oblinger, deceased.)

Court, certainly a *certiorari* is not necesary to remove an appeal from the Orphans' Court to the Circuit Court. This would seem to be a writ not issuable by the Circuit Court after judgment by any lower court. The *certiorari* and its return day are then laid out of the case. Is the appeal from the Orphans' Court to be filed before the next sitting of the Circuit Court, in the county, or before the next return day? I think not before the latter. There could be no rule for filing exceptions, or *non pros* for not doing so until the return day next succeeding the appeal. It would expedite business were it considered as returnable to the next sitting of the Circuit Court in that county; but under the existing laws, we cannot compel a return before the next return day. But here the appeal was filed, and decided by the Circuit Court, and no objection on this account made, and an appeal taken to this court, where the objection is first heard. We think it cannot avail at this time, it is too late; and, generally, if a party goes to trial by consent, in a lower court, at an earlier term than he was compellable to do, if he makes no objection then, his objection will not avail him afterwards—I am glad that in this case no injury is done to the party who alleged surprise.

The Orphans' Court, in 1801, in accordance with the will, directed four hundred pounds to be put out at interest, on bond and judgment, binding lands, for the purposes mentioned in the will, the principal payable at the death of the widow. Instead of noticing the bequest of one thousand pounds to *John, first and foremost,* the remaining three hundred and fifty pounds, were divided equally among the children; a judgment creditor of *John's* got his share. We think this was wrong, but it is not before us, and we could not now remedy it if it were. The widow died in November, 1803, but the executors of *Oblinger,* to whom the bond was given, did not collect the money, nor even bring suit till 1814, and the cause was not tried and money raised till 1828. The executors then brought it into the Orphans' Court, and several questions were made as to the distribution. A person who had obtained a judgment against *John* claimed it, and the court decided against him: he then brought the record into court and showed that *John* had applied for the benefit of the insolvent acts; had assigned to trustees for the use of his creditors, and been discharged. The court decided the judgment was no lien, and rightly. Whatever *John's* interest originally was, under the will of his father, in the lands of his father, yet when those lands had been sold, and the money brought into court, and was again put out to interest, it became personalty; the bond was a mere chose in action; and although judgment was afterwards entered on it, yet whoever heard of a judgment being a lien on another judgment? The court next decided that they could not award the money to *John,* as his interest was vested in

43

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian Oblinger, deceased.)

his assignees, and it made no difference that the original assignees were dead, and no successors had been appointed. They would give time to apply to the Common Pleas to appoint others. This opinion was clearly right. If the debtor of an insolvent who has assigned, pays the insolvent, the assignees can compel him to pay again to them. If it were not so, our insolvent acts would be a fraud on the creditors. And it would be strange if our courts were not bound to take notice of a general law. It does not alter the case that the application was not made by an assignee. Chancery when informed of a party in interest, not before it, always brings him in. But it has been said the statute of limitations has barred all claims against *John*, or that from lapse of time his debts are presumed to be paid. Our insolvent act of 1729–30, and every act since provides, that notwithstanding the discharge of the insolvent under the act, all debts due and owing from such debtor, and all and every judgment had and taken against him, shall stand and be good and effectual in law, to all intents and purposes, against the lands, tenements and hereditaments, goods and chattels of such debtor, which he or any other person or persons in trust for him at the time of his discharge, shall have had, or at any time thereafter shall or may be in any way seized or possessed of, interested in, or entitled to in law or equity. This would seem to put the statute of limitations out of the way in such case: but further, the court may, on consent of a majority in number and value of the creditors, make an order that the insolvent shall not be sued for seven years. If the statute of limitations runs against a person discharged under the insolvent laws, this order would put an end to all claims barred by a lapse of six years. I do not say that lapse of time, much greater than that allowed by the statute, will in no case raise a presumption of payment. This will often be the case, when assignees act and have property in their hands. This however was not such a case as would justify the Orphans' Court in, at once, considering these debts paid. Where a creditor returns no funds, but some debts not to be collected till after a certain event, (as here the death of his mother,) it would be strange to say the debts were to be presumed paid before the fund came to hand. This is however a matter to be decided in the Common Pleas. The Orphans' Court were right in detaining the money until assignees should appeal. Those assignees will be trustees for the creditors, and for *John*, if there are no creditors, or there be a surplus after payment of his debts. We think, however, that a time should have been limited within which the creditors should apply and get assignees; *John* is not to wait forever in suspense; we therefore confirm this part of the decree, with this addition, that if the creditors do not apply, and get assignees who will give security at

(Appeal by John Feather, in the matter of the money arising from the sale of the real estate of Christian Oblinger, deceased.)

next term of the Common Pleas, in August, 1830, that the money be paid to *John Oblinger* or his lawful attorney.

There was another matter mentioned which admits of no doubt. One of the sisters prayed the money awarded by the decree of the court, to be paid to her. There was an appeal to the Circuit Court, and a few minutes or a few hours elapsed before the recognizance of bail could be drawn up, and bail brought before the court, but it was done the same day, and before the court rose. And the court refused to order the money instantly to her; most clearly the court were right. To have given it to her, under such circumstances, while the recognizance was writing, and bail coming in, would have been grossly wrong. The decree, with the addition above mentioned, is in all respects confirmed.

Decree affirmed.